IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 92-4220

---

DARREYL WAYNE GOUGH,

Plaintiff-Appellee,
Cross-Appellant,

versus

NATURAL GAS PIPELINE CO.
OF AMERICA,

Defendant-Appellant,
Cross-Appellee.

---

Appeals from the United States District Court
for the Eastern District of Texas

---
July 20, 1993

Before REYNALDO G. GARZA, HIGGINBOTHAM, and DeMOSS, Circuit Judges.

HIGGINBOTHAM, Circuit Judge:

When a fishing vessel backed over a natural gas pipeline that was supposed to have been buried, a fireball swept the ship killing eleven of its fourteen crew. Her captain, Darreyl Wayne Gough, survived by fleeing the pilot house and jumping overboard. He sued the pipeline owner, NGP, under general maritime law. A Beaumont jury awarded Captain Gough $2 million, but assessed to him 35 percent of the fault for the accident. NGP challenges the damage award which rested in substantial part on emotional distress. We are persuaded that Captain Gough suffered a sufficient physical impact but order a remittitur of damages. We also affirm the finding of contributory fault, finding the evidence sufficient to

support it, rejecting the Captain's claim that an earlier finding in a limitation proceeding that NGP was solely at fault was binding.

I

On October 3, 1989, Zapata Haynie Corporation's steamer F/V Northumberland was operating near Sabine Pass. Darreyl Wayne Gough captained the vessel as it fished for menhaden roughly one-half mile from the Texas coast. The Captain had previously fished in the same area of the coast during the 1988 and 1989 fishing seasons. He did not consult navigational charts on October 3; he claimed to know that coastline "like the back of [his] hand."

Late that afternoon, when the Northumberland deployed its purse boats, radar showed that it was one-half mile from shore. Captain Gough's cousin Mac Gough was in charge of the ship while Captain Gough was in a purse boat. Mac Gough thought that the Northumberland was floating freely, not touching bottom, because the ship moved without hindrance. He admitted that it was possible for the ship to skim through the soft mud bottom of Sabine Flats without being felt on deck. After the set, Captain Gough returned to the pilot house of the Northumberland. The ship's bow was pointed toward the shore. Around 5:45 p.m., Captain Gough began backing the ship away from the beach at what Mac Gough described as moderate speed. All three survivors, Captain Gough, Mac Gough, and crew member Arthur Jackson, testified that the ship did not touch bottom.

After backing three hundred feet, the Northumberland suddenly stopped. There was an immense explosion. The ship struck and ruptured NGP's submerged sixteen-inch diameter gas pipeline. Within seconds, a fireball swept the ship from stern to bow. The Captain and Mac Gough escaped the pilot house, jumped overboard, and swam away from the heat and flames. Spotter helicopters dropped rafts and tried to assist survivors. Captain Gough tried to assist one injured seaman who slipped away and drowned. Eleven crew members died; Mac Gough and Jackson were severely burned. All three survivors were pulled from the water and airlifted to a Beaumont hospital by helicopter.

Captain Gough was in the hospital for only two days, but soon began experiencing nightmares, flashbacks, and depression. Psychiatrists and psychologists diagnosed post-traumatic stress disorder, and Captain Gough began therapy. One expert testified that post-traumatic stress disorder typically requires two to three years of treatment. Captain Gough's therapist testified that the demands of various lawsuits continue to aggravate Captain Gough's condition and delay recovery. She was uncertain how long it would take before Captain Gough could function adequately, and noted that the memories of this event will remain the rest of his life.

Captain Gough claimed that as a result of the post-traumatic stress disorder, he was unable to return to work as a mariner. He now earns his living, for less pay, as a carpenter. An economist testified that this diminished earning capacity resulted in a total pecuniary loss of $559,401.

The NGP pipeline was unmarked.  The Corps of Engineers permit issued to NGP in 1972 required that the pipeline be buried three feet under the seabed and that NGP maintain it in accordance with the plans.  Three days after the accident a diver inspected the pipeline and found it exposed for more than fifty feet between the point at which the Northumberland sank and the shore; it was exposed for more than three hundred feet farther out to sea.  In places, nearly half of the pipe's diameter was unburied.

NGP elicited testimony suggesting that Captain Gough's handling of the ship could have led to the allision.

On a previous occasion, the Northumberland's anchor had gotten hung up on a submerged five-inch pipeline after the ship was anchored overnight.  The anchor picked up the pipeline, but came free after it was lowered again.  Mac Gough testified that Captain Gough occasionally got into the mud, rather than always maintaining a margin between the keel and bottom.  The Northumberland was not equipped with a fathometer.  Coastline charts feature a warning concerning submerged pipelines.  National Ocean Service chart 11342 states:  "Caution . . . Additional uncharted submarine oil and gas pipelines and submarine cables may exist within the area of this chart.  Mariners should use caution when anchoring, dragging or trawling."  Captain Gough admitted that he was familiar with this warning.

The six-person jury deliberated for eighty-two minutes.  In a note to District Judge Fisher, the jury asked whether it could

4

award Captain Gough more than he asked for.[1]  It then found both NGP and Captain Gough negligent and responsible for the accident. The jury assigned them 65 and 35 percent of the fault, respectively.  The verdict then awarded Captain Gough $2,000,000 in total damages.[2]

## II

Captain Gough's physical injuries had little compensable value.  He presented evidence of economic loss, but the principal basis on which the Captain sought damages was the emotional distress associated with post-traumatic stress disorder.  NGP contends that the maritime law does not permit recovery for purely emotional damages.  We think that this assertion is too broad.

Beyond question, purely emotional injuries will be compensated when maritime plaintiffs satisfy the "physical injury or impact rule."  Plaisance v. Texaco, Inc., 966 F.2d 168-169 (5th Cir. 1992) (en banc).  Either a physical injury or physical impact has traditionally been required.  See Hagerty v. L & L Marine Services, Inc., 788 F.2d 315, 318 (5th Cir. 1986).[3]  Hagerty, a Jones Act case, questioned the wisdom of this rule, but found that the

---

[1]Judge Fisher replied that it could award no more for lost earnings than the evidence established, but could award whatever amount necessary to justly compensate Captain Gough for his pain and suffering or mental anguish.

[2]The jury did not find gross negligence, precluding the award of punitive damages.

[3]We note that the en banc court also referred to the rule in disjunctive terms:  physical injury or impact.  Plaisance, 966 F.2d at 168; see also id. at 169 (Politz, C.J.) ("physical injury or contact").

5

plaintiff suffered both a physical impact and injury.  Id. at 318 & n.1.

The impact or injury rule is an arbitrarily stated rule with important functions.  One purpose is "to provide courts with an objective means of ensuring that the alleged mental injury is not feigned."  Hagerty, 788 F.2d at 318.  A more important purpose of the rule is to provide a principled basis for limiting liability.  Traumatic events may cause foreseeable emotional distress through a broad range of time and space.  Jurisdictions that apply expansive recovery rules such as the bystander theory must depend upon proximate cause to define the boundary of liability.  We are wary of such ad hoc adjudication and prefer predictable rules for the determination of liability.  Cf. State of Louisiana ex rel. Guste v. M/V Testbank, 752 F.2d 1019, 1028-29 (5th Cir. 1985) (en banc) (requiring physical injury to proprietary interest for recovery of economic damages in admiralty).  The bright line impact or injury rule performs a similar function.

NGP misplaces its reliance on Gaston v. Flowers Transp., 866 F.2d 816 (5th Cir. 1989).  The plaintiff in that Jones Act case watched as his half-brother was crushed between two colliding vessels.  The plaintiff himself suffered only a bruised elbow when he fell to the deck.  He did not consider himself to be in danger. The plaintiff, diagnosed with post-traumatic stress disorder, sought damages for his emotional distress.  He did not establish that he had suffered a physical impact or significant physical

6

injury. His only claim was for emotional distress caused by witnessing his brother's death.

Gaston dismissed as dictum the suggestion in Hagerty that emotional distress recovery might occur without physical injury or impact. Id. at 819 (quoting Hagerty, 788 F.2d at 318). The Gaston plaintiff, a mere bystander, could not recover for his emotional distress. Id. at 820. Left open is the question whether a plaintiff may recover under the zone of danger theory. Id.; see also Plaisance, 966 at 169.

NGP emphasizes that Gaston described the plaintiff's bruised elbow as "only [a] trivial physical injury." Insisting that Captain Gough's physical injuries are no more substantial, NGP maintains that Gaston's denial of recovery controls this case. NGP understates the evidence of Captain Gough's injuries and the nature of his experience. Captain Gough was located in the pilot house when the steamer allided with NGP's pipeline. Within seconds, flames spread towards Captain Gough. He could feel the heat, and immediately after he left the pilot house fire engulfed it. To avoid the flames, Captain Gough had to jump overboard into the Gulf of Mexico. Even in the water, the heat was unbearable, and Captain Gough inhaled fumes from the fire. He also ingested salt water, as another victim of the disaster pulled him underwater. Besides being submerged in the ocean, Captain Gough suffered multiple contusions. Finally, some testimony suggests that Captain Gough suffered from minor burns, although no medical record confirmed these opinions.

Keeping in mind its purpose, these facts meet the impact test. Emotional distress damages were awarded to a seaman on this basis in Petition of United States, 418 F.2d 264 (1st Cir. 1969). A Coast Guard vessel was towing Roberts' boat when it ran aground, capsized, and sank. Roberts was forced into the sea, where he remained for more than thirty minutes before being rescued by the Coast Guard vessel. The court allowed Roberts to recover for emotional distress, stating:

> The grounding of the B & G resulted in a substantial jolt to Roberts and he was thrown into the water as the boat capsized. Both these impacts were caused by the negligence of the [Coast Guard] and were sufficient to satisfy the test applied by jurisdictions following the impact rule.

Id. at 268.

Our precedent also supports the conclusion that Captain Gough has suffered the requisite impact. In Hagerty, the seaman was drenched with toxic and carcinogenic chemicals. At the time, he felt dizziness, leg cramps, and stinging in his extremities. As a result of this accident, he developed cancerphobia. We held that drenching with chemicals constituted a sufficient impact to support the recovery of emotional distress damages. Hagerty, 788 F.2d at 318 n.1. The proof of impact, and of physical injury, is even more convincing in the present case.

Unlike Gaston, this accident caused Captain Gough far more harm than a fall to the deck and a bruise. Captain Gough suffered both a physical impact and tangible physical injuries as a foreseeable result of NGP's negligence.

8

Captain Gough argued that if the impact rule was not satisfied, he could nonetheless recover for emotional distress because he was within the zone of danger. We have repeatedly declined to adopt or preclude the zone of danger theory. See Gaston, 866 F.2d at 820; Plaisance v. Texaco, Inc., 966 F.2d 166, 169 (5th Cir. 1992) (en banc); Ainsworth v. Penrod Drilling Corp., 972 F.2d 546, 548 (5th Cir. 1992). Since Captain Gough may recover on another basis, we once more leave this question open.

III

NGP also complains that the jury verdict must be set aside as excessive. The district court denied NGP's motion for new trial, which contended that the award of $2,000,000 was beyond any reasonable bound.

The jury's assessment of damages is heavily weighted against appellate reconsideration. We do not disturb a jury verdict for excessiveness except on the strongest of showings. Even so, "[t]he sky is simply not the limit for jury verdicts." Caldarera v. Eastern Airlines, Inc., 705 F.2d 778, 784 (5th Cir. 1983). The verdict will not stand if it is entirely disproportionate to the injury sustained. Id.[4] When a jury's award exceeds the bounds of any reasonable recovery, we must suggest a remittitur ourselves or direct the district court to do so. In that case, we reduce the

---

[4]Such verdicts have been variously described: so gross or inordinately large as to be contrary to right reason; shocking the judicial conscience; clearly exceeding that amount that any reasonable person could feel claimant is entitled to; or so exaggerated as to indicate bias, passion, prejudice, corruption, or other improper motive. See Caldarera, 705 F.2d at 784.

9

verdict to the maximum amount the jury could properly have awarded. Id.

We will consider any quantifiable evidence of pecuniary loss. The principal basis of relief, however, was emotional distress--an inherently subjective matter. Our reassessment cannot be entirely supported by rational analysis, and must depend upon experience and judgment. See id.; Osburn v. Anchor Laboratories, Inc., 825 F.2d 908, 920 (5th Cir. 1987). We may also look to the "rough guidance" of awards for similar injuries in recent cases. Osburn, 825 F.2d at 920; Simeon v. T. Smith & Son, Inc., 852 F.2d 1421, 1427 (5th Cir. 1988).

In this case, the jury's general damage award of $2,000,000 included the following elements: lost past and future earnings, pain and suffering, mental disability and mental anguish. An economist valued Captain Gough's lost earnings at $559,401. NGP concedes that this much of the damage award is unassailable. Captain Gough's physical injuries resolved within days of the accident. While these injuries were real and tangible, we conclude that their compensable value is negligible. Thus, the remainder of the verdict ($1,444,599) must be supported by the evidence of mental disability and mental anguish.

Captain Gough narrowly escaped a harrowing disaster with minor physical injuries. He suffers, however, from on-going emotional distress in the form of post-traumatic stress disorder. The disorder typically resolves in two to three years, but experts were unable to predict the resolution of Captain Gough's condition.

10

Testimony suggests its perpetuation by Captain Gough's involvement in lawsuits arising from the accident.

Other cases show virtually no satisfying analogues to Captain Gough's injuries. Many post-traumatic stress disorder patients also suffered severe physical injuries; others were themselves neither injured nor endangered. Captain Gough falls between these extremes. Perhaps the best guidepost involves the survivor of a gas-leak explosion that destroyed a house in Illinois. DeYoung v. Alpha Constr. Co., 542 N.E.2d 859 (Ill. App. 1989). The explosion threw the plaintiff 75 feet out of her home and into a neighbor's yard, bruising the left side of her body, fracturing three teeth, and requiring stitches for her mouth, lips, and chin. Her mother was killed. Afterward, the plaintiff experienced insomnia, depression, and anxiety and was diagnosed with post-traumatic stress disorder. The court affirmed an award of $500,000 for the plaintiff's noneconomic damages. Id. at 864.

We must rely upon our judgment to determine the maximum amount the jury could properly have awarded. See Caldarera, 705 F.2d at 784 (stating the "maximum recovery" rule). Considering the circumstances of the accident and the evidence of mental anguish and disability, $600,000 represents the maximum reasonable award for emotional distress. Adding the economic damages of $559,401, the verdict must be reduced to $1,159,401, less the reduction for contributory fault. We therefore order a new trial unless Captain Gough will accept a remittitur amending the judgment to the amount of $753,610.65.

IV

The district court denied Captain Gough's motion for a judgment notwithstanding the jury's verdict that he was 35 percent at fault. We review this decision under the familiar standard of Boeing Co. v. Shipman, 411 F.2d 365 (5th Cir. 1969) (en banc). To prevail, Captain Gough must show that the facts and inferences point so strongly and overwhelming in his favor that reasonable persons could not arrive at a contrary verdict. Id. at 374.

The jury heard that the depth of the water at spots around the Northumberland, three days after the accident and near the same time of day, measured eight and nine feet. The steamer's draft was described as nine or ten feet. Captain Gough did not employ a depth meter. NGP argued that Captain Gough acted unreasonably by either dragging through the mud bottom or failing to maintain a margin of safety under the keel of his ship.

Captain Gough denies touching bottom. All three survivors testified to floating freely, although Mac Gough said that the ship could move through soft mud without hindrance. The pilot of the spotter plane did not see a trail of mud to indicate dragging. Captain Gough also defended his conduct by asserting that all submerged pipelines were assumed to be safely buried beneath the seabed. He knew that there were pipelines in the vicinity, but assumed that they could not be hit. He also initially stated that he had never heard of any ship hitting a pipeline, despite fishing in the area for thirteen seasons. Finally, Captain Gough maintains

12

that the non-use of charts was causally unrelated because the NGP pipeline was not accurately charted.

Nonetheless, some evidence supports the reasonable conclusion that caution was in order. Charts of the coastline warned of uncharted pipelines and advised that "Mariners should use caution when anchoring, dragging or trawling." On cross-examination, Captain Gough admitted knowing that the Zapata Haynie vessel Sea Chief had struck a pipeline in Mississippi waters. His own ship had lifted a five-inch pipeline from the bottom with its anchor. Captain Gough replaced it on the seabed and therefore knew that it was not buried. There is ample evidence by which a reasonable factfinder could conclude that Captain Gough's conduct contributed to this tragedy.

Captain Gough also attacks the contributory fault finding by contending that he had no duty to avoid the pipeline. Starting with the premise that NGP's unburied pipeline created an obstacle to navigation, Captain Gough concludes that the priority of navigation demands that NGP bear sole responsibility for the allision. "[Plaintiff] is incorrect, however, to assert that this right of navigation is wholly unfettered: when a mariner knows of obstructions to navigation, he must avoid them." Pennzoil Producing Co. v. Offshore Express, Inc., 943 F.2d 1465, 1470 (5th Cir. 1991). The presumption of fault of The Pennsylvania, 86 U.S. (19 Wall.) 125 (1874), does not control the allocation of fault where several parties are responsible; the rules of comparative fault still apply. Pennzoil, 943 F.2d at 1472. The record shows

13

that Captain Gough could foresee the danger posed by unburied pipelines. A duty therefore arose, and the district court properly submitted the issue of Captain Gough's fault to the jury.

V

Captain Gough also maintains that the question of his contributory negligence should not have been submitted to the jury. He seeks to bind NGP with a district court finding from the Western District of Louisiana that NGP is solely responsible for the accident. Captain Gough's employer, Zapata Haynie, filed a limitation action in that court regarding the Northumberland. Captain Gough did not join that action. NGP and the representatives of other victims of the accident contested Zapata's right to limitation or exoneration. In particular, NGP attempted to show that Captain Gough's errors contributed to the accident. Following a three-week bench trial, District Judge Walter found that NGP's negligence was the sole cause of the accident. On appeal, we held that this finding was not clearly erroneous. Zapata Haynie Corp. v. Arthur, 980 F.2d 287 (1992).

While Captain Gough was not a party to the previous action, NGP was and so Captain Gough now invokes the doctrine of issue preclusion, also known as offensive collateral estoppel. Captain Gough complains that the jury's finding of fault is inconsistent with Judge Walter's finding. Captain Gough did not, however, assert collateral estoppel below, even though Judge Walter ruled

14

seven months before Captain Gough's trial.[5]   Captain Gough

mentioned Judge Walter's findings in his pretrial Memorandum of

Authorities.   Captain Gough did not, however, request that those

findings be given preclusive effect.   Nor did he mention Judge

Walter's findings in his motion for judgment notwithstanding the

verdict of contributory fault.[6]

The offensive use of collateral estoppel is permitted, but

limited by judicial discretion. Parklane Hosiery Co. v. Shore, 439

U.S. 322, 331, 99 S. Ct. 645, ---, 58 L. Ed. 2d 552 (1979).   Courts

hesitate to allow "wait and see" plaintiffs to benefit from

offensive collateral estoppel after failing to present their claims

in the prior litigation.   See, e.g., Hauser v. Krupp Steel

Producers, Inc., 761 F.2d 204, 207 (5th Cir. 1985).

> The general rule should be that in cases where a
> plaintiff could easily have joined in the earlier action
> or where . . . for other reasons, the application of
> offensive estoppel would be unfair to a defendant, a
> trial judge should not allow the use of offensive
> collateral estoppel.

Parklane, 439 U.S. at 331, 99 S. Ct. at ---.

NGP contends that Captain Gough could have joined the

limitation action.   Captain Gough responds that participation would

have been self-defeating because, as master of the Northumberland,

---

[5]Judge Walter's judgment had preclusive effect during the
pendency of its appeal.  Erebia v. Chrysler Plastic Prods. Corp.,
891 F.2d 1212, 1215 n.1 (6th Cir. 1989); Nixon v. Richey, 513
F.2d 430, 438 n.75 (D.C. Cir. 1975); cf. Huron Holding Corp. v.
Lincoln Mine Operating Co., 312 U.S. 183, 189 (1941).

[6]At oral argument, Captain Gough contended that he objected
to submitting the contributory fault issue to the jury on this
basis.  Captain Gough failed to get this objection into the
record and we may not rely upon it.

evidence suggesting Zapata Haynie's fault also suggested his own fault. NGP maintains that Captain Gough did not join the previous action because he settled with the ship owner. The record does not indicate when that settlement occurred. The uncertainty of this issue reflects the critical problem with Captain Gough's position-- he failed to raise it below by drawing attention to issue preclusion.

Captain Gough objects to the resulting inconsistent fact findings, but collateral estoppel would not eliminate the inconsistent decisions. See Jack Ratliff, Offensive Collateral Estoppel and the Option Effect, 67 Texas L. Rev. 63, 100 (1988). They happen--and once inconsistent decisions have been reached, none may be given preclusive effect. Parklane, 439 U.S. at 330-31 & n.14. Prof. Ratliff observed that "efficiency is [offensive] collateral estoppel's only true justification." Option Effect, supra, at 101. It is too late to invoke the virtue of efficiency when the case has already been tried.

We are not persuaded that the district court committed reversible error in submitting the issue of Captain Gough's fault to the jury. Captain Gough failed to address the issue as one of collateral estoppel in the district court. Even reviewing it as such, there is no showing that the court abused its discretion in declining to give Judge Walter's findings preclusive effect. In short, Captain Gough has failed to show an injustice.

In a related argument, Captain Gough asserts that affirming the jury's finding of contributory fault would violate our rule

16

that one panel cannot overturn another. This assertion is meritless. In <u>Zapata Haynie</u>, we held that Judge Walter's finding that NGP was solely responsible for the accident was not clearly erroneous. 980 F.2d at 292. By affirming the jury's findings here we do not upset any rule of law stated in <u>Zapata Haynie</u>.

We affirm the district court in all respects except we remand with instruction to grant a new trial unless plaintiff accepts the remittitur we order today.

AFFIRMED in part and REMANDED.