**Ludmilla ZURBA, Plaintiff,**

v.

**UNITED STATES of America,
Defendant.**

No. 99 C 3586.

United States District Court,
N.D. Illinois,
Eastern Division.

Sept. 28, 2001.

Paul B. Episcope, Chicago, IL, for Plaintiff.

Maria Simon, Asst. U.S. Atty., United States Attorney's Office, Chicago, IL, for Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

KENNELLY, District Judge.

In this case under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2674, the Court previously found the United States 33⅓% liable after a trial limited to the issue of liability.[1] The Court has just con-

---

1. The Court's understanding, confirmed by the parties at trial, is that the effect of this is

cluded a trial concerning the issue of damages. This constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

On the morning January 11, 1995, plaintiff Ludmilla (Lucy) Zurba was standing on the corner of Michigan Avenue and Ohio Street in Chicago, waiting to cross the street to catch a bus. Without warning, she was struck by an automobile that was propelled into her after a collision with two other automobiles. The car that struck Zurba was driven by a law enforcement officer assigned to a Federal Bureau of Investigation task force.

Zurba was knocked to the ground and suffered lacerations and contusions, and she experienced severe pain. She was taken to Northwestern Memorial Hospital, where just before her release it was discovered that she had internal bleeding. Exploratory surgery revealed a laceration to her right kidney, and surgery was performed to repair the laceration. No part of her kidney was removed. Zurba was given a blood transfusion in conjunction with her surgery. She remained in the hospital for about ten days.

Prior to the accident, Zurba had been living with her long-time boyfriend in downtown Chicago. After her release from the hospital, she was bedridden for six weeks, suffered considerable pain, and was unable to get around or take care of herself during most of that time. She spent her convalescence at the suburban home of her older sister. Once she was able to do so, she returned to the downtown Chicago apartment where she and her boyfriend lived.

At the time of her injury, Zurba was employed as an assistant in the human resources department of a local law firm.

In late March or early April 1995, she was advised that her medical leave had been used up and she would be terminated if she did not return to work. She was still suffering from pain and discomfort from her injuries and surgery, but she needed the income from her job and thus returned to work against her doctors' advice. She was allowed to work half days for four weeks but then was pressured to return to full time duty.

After returning to work, Zurba continued to experience severe abdominal and chest pain. These episodes became longer and more severe. She sought medical care and was prescribed Vicodin, a pain medication. Often the normal dosage of the pain medication did not suffice because of the severity of the pain, and when this happened Zurba would take extra pills. She felt that her entire existence was focused on seeing doctors and trying to deal with her pain.

Because of her continuing pain, Zurba underwent further diagnostic testing. Eventually, in December 1995, she was advised that a test had revealed an obstruction in her bile duct. She underwent surgery, again at Northwestern Hospital, to resolve the obstruction and remove her gall bladder. She remained in the hospital for one week following the surgery and then spent approximately six weeks at home convalescing.

Zurba was required by her employer to return to work after being off for about six weeks. Following her return to work, her job in the human resources department was taken away, and she was made supervisor of the word processing department. There is no evidence, however, that her salary was reduced.

to make the United States jointly and severally liable for plaintiff's damages, *see* 735 ILCS 5/2–1117, though it gets an offset for the

$100,000 that Zurba obtained via settlement from the other tortfeasors. *See* 740 ILCS 100/2(c).

Following her recovery from the gall bladder surgery, Zurba's pain decreased somewhat, but after a relatively short period she began to experience upper abdominal pain and frequent bowel movements. As many as twenty times per day, she would experience an immediate need to have a bowel movement; this would happen as a result of physical activity or even wearing tight clothing. Zurba frequently found herself having to quickly find a bathroom. As a result of this, she restricted her activities and movements, and she began to wear looser clothing.

Zurba sought medical care for her abdominal pain and bowel problems. In April 1996, Dr. Alfred Torrence made a tentative diagnosis of probable irritable bowel syndrome, a common disorder of the colon that causes cramping and loose stools. He prescribed an over-the-counter medication. He also advised Zurba that she likely would suffer from the effects of irritable bowel syndrome on and off for the rest of her life and that stress management, including psychotherapy, could help her manage the disorder. Zurba did not pursue psychotherapy at the time, believing that the over-the-counter medication that Dr. Torrence had prescribed would suffice.

The irritable bowel syndrome has decreased somewhat in severity since Zurba began to be treated by Dr. Torrence and others. It is likely to persist in causing Zurba pain and difficulty with her bowels, at least in the near term, but the symptoms can be managed effectively with treatment.

Zurba's surgeries have left her with a disfiguring scar that runs the length of her abdomen. Due to her surgeries, she also has "adhesions," internal scar tissue that forms as a normal result of abdominal surgery. Adhesions, like Zurba's external scar, are permanent. They can cause pain and likely are doing so in Zurba's case, and

this pain is likely to increase somewhat as time goes on. Zurba has been aware of this since around the time of her gall bladder surgery. It is possible, though highly unlikely, that she will require further abdominal surgery if pain from the adhesions does not respond to other forms of treatment.

In the year 2000, Zurba began suffering from pain in her right side, radiating to her back and shoulder. This was different from the pain she had experienced before. As of the date of the trial, there was no definitive diagnosis of the cause of this pain, though there is reason to believe that it may result from fibromyalgia, a disorder characterized by chronic and generalized aching, joint pain, fatigue, headaches, anxiety, and sometimes irritable bowel syndrome. *See* Cecil Essentials of Medicine at 658–59 (2d ed.1990). Though the cause of this disorder is unknown, there was credible testimony that it can be associated with high stress levels. There is, however, no diagnostic test that can definitively confirm a diagnosis of fibromyalgia.

In sum, Zurba continues and will continue to experience physical pain stemming from the accident, though certainly not at the same level as she experienced through the time of her gall bladder surgery. She has, however, no appreciable risk of future impairment to any internal organs, nor does she have any appreciable risk of viral infections resulting from her blood transfusion.

Zurba has also suffered considerable emotional distress as a result of the accident. While in the hospital in January 1995, in addition to physical pain she experienced emotional trauma, including fear of the dark, fear of being left alone, and nightmares. She was offered a psychological consultation but declined it, saying that she wanted to concentrate on her physical injuries and that she had her own psychia-

trist. (In fact she had never been treated by a psychiatrist; what she was referring to was some "couples" counseling sessions that she had attended in the past.)

Following her return to work, Zurba was both physically unable and, understandably, unwilling to walk to her regular bus stop along the busy streets of downtown Chicago, where the accident had occurred. Her boyfriend took her to and from work in taxis as long as they remained living in downtown Chicago. After they moved to a western suburb about five years ago, Zurba began to take the train to work. However, out of fear of again becoming an accident victim, she still has her boyfriend accompany her for a significant part of her walk from the train station to her workplace.

Before the accident, Zurba was an energetic, outgoing, motivated, and independent person. She and her boyfriend lived a very active life—as he put it, they "were never home" because they spent so much time bicycling, walking, and going out with each other and with friends. Zurba also played tennis from time to time. She traveled a lot, took pride in her appearance, and had many friends. She was ambitious and motivated about her work.

All of this has changed since the accident. As described by her boyfriend and older sister, Zurba is a "completely different person" now. She spends virtually all of her non-working hours at home. Zurba no longer feels or acts like an independent person; she feels a constant need to have someone with her. She no longer goes out with friends and rarely goes out with her boyfriend. She has completely stopped bicycling, playing tennis, and taking walks. She is essentially homebound except when at work and commuting.

Zurba is frequently moody and tearful, experiences nightmares, and is constantly on edge about her health. Whenever she becomes ill, no matter how mild the illness, she becomes concerned that she is experiencing continued and ongoing after-effects from the accident and her surgery. She also has a decreased interest in sexual activity. To put it in a nutshell, she no longer enjoys life.

The Court had the opportunity to observe Zurba when she testified and during the course of the trial. Her demeanor and affect completely confirmed the testimony of those closest to her about the changes in her life since the accident.

One important aspect of Zurba's emotional injury is that she is victimized by constant and recurring fears which, though not debilitating, have severely hampered her everyday life. Indeed, her ongoing emotional injuries are at present more severe than her ongoing physical injuries. She no longer feels safe and is constantly concerned that she will become the victim of a catastrophe. She is afraid of walking on the street for fear that she will once again be the victim of an unexpected collision. She has an intense fear of traveling by airplane; on one of the few occasions when she tried to travel by air after the accident, she became so fearful that she caused a scene in the airplane. She harbors lingering concern that her transfusion involved tainted blood and fears that she will contract a disease as a result. Though Zurba no doubt recognizes, on some level, that this fear has no objective basis, it plagues her nevertheless.

Though Zurba has experienced these emotional and psychological symptoms in greater or lesser degree since January 1995, the Court found credible the testimony that Zurba's condition has become significantly worse in the last three to four years. Just as importantly, it was not until quite recently that she realized that her "symptoms" stemmed from a psychiatric condition. Prior to that time, Zurba understood her decreased activity level to

be the normal result of her surgeries, physical discomfort, and, later, her bowel problems. She expected that as each of these problems subsided (as she reasonably expected them to do), things would return to normal. She did not understand these problems to be what we now know they were, namely a psychiatric disorder that was caused by the accident but which is separate and distinct from her physical injuries. Zurba also chalked up her fears of traffic, airplanes, and the like as a reasonable and normal reaction to the traumatic event she had experienced, rather than as indicating ongoing emotional distress or an underlying psychiatric disorder.

In March 2001, Zurba sought psychotherapy for the first time. There were two events that triggered this. The first took place when she missed her train stop and became panicked after she got off at the next stop, afraid even to approach others to seek directions. The second took place after a doctor's appointment when she approached, during daylight hours, a train platform in the suburb of Winnetka on which a lone male was standing. Though there was nothing objective to suggest that the man might seek to do her harm, Zurba experienced intense fear and was unable to stand on the platform. These events led Zurba to realize that her fears had "taken on a life of their own" and caused her to seek therapy.

Both sides' experts testified that Zurba suffers from an adjustment disorder with features of depression and anxiety, as well as an anxiety disorder. An adjustment disorder involves "the development of clinically significant emotional or behavioral symptoms in response to an identifiable psychosocial stressor or stressors." Diagnostic and Statistical Manual of Mental Disorders, p. 623 (4th ed. 1994) ("DSM–IV"). An anxiety disorder involves uncontrollable fears and worries which interfere with the individual's life in some way, as well as symptoms of restlessness, fatigue, muscle tension, sleep disturbance, trouble concentrating, and/or irritability, as well as an impairment of the individual's social or occupational functioning. See DSM–IV, pp. 432–36, 444. Zurba's treating psychiatrist and the government's expert agreed that the Zurba's disorders were the result of the January 1995 collision.

Zurba first sought psychotherapy in March 2001 following the two incidents mentioned earlier. Since beginning psychotherapy, she has attended a number of sessions but has also missed several appointments. She also has not thus far pursued her psychologist's referral to a psychiatrist to evaluate her for as a candidate for medication. Based on the testimony of her treating psychologist, the Court is convinced that this is common with patients suffering from disorders of this type, as (among other reasons) they may be afraid to discuss the underlying events and are reluctant to be open about their symptoms. Indeed, lack of understanding of her condition and reluctance to pursue treatment may be part of the constellation of symptoms that make up Zurba's psychiatric condition. Her psychologist credibly testified that it is not at all uncommon for a person with her conditions to require considerable time and effort on the part of the therapist before fully cooperating with treatment efforts.

Zurba's adjustment and anxiety disorders are treatable with proper care. She has already begun one component of that care, namely psychotherapy from a psychologist or psychiatrist to assist her in dealing with these conditions and with managing stress. Zurba may also require medication (which would have to be prescribed by a psychiatrist) to assist her in overcoming these disorders. If she pursues treatment, there is every reason to

believe that it will be successful, as adjustment and anxiety disorders are among the most treatable psychiatric conditions. The evidence shows that it is reasonable to expect that a two year course of treatment will enable Zurba to reduce her symptoms to manageable levels and to deal with future stress. The Court did not find credible the claim that the delay in treatment has made Zurba's condition more difficult to treat.

On August 6, 1996, Zurba filed an administrative claim with the government pursuant to 28 U.S.C. § 2675(a). The claim described the accident and stated that as a result, Zurba had "suffered severe internal injuries" consisting of a kidney laceration and an injury to her gall bladder. It made no mention of any emotional or psychiatric effects of the accident. In the claim, Zurba stated that she was claiming damages in the amount of $300,000.

■ Under the FTCA, the law of the place of the wrongdoing generally governs the nature and extent of damages. *Richards v. United States*, 369 U.S. 1, 11–12, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962); *Torres v. United States*, 953 F.Supp. 1019, 1024 (N.D.Ill.1997). Under Illinois law, Zurba is entitled to recover damages for her injuries that were proximately caused by the collision. *See, e.g., First Springfield Bank & Trust v. Galman*, 188 Ill.2d 252, 256, 242 Ill.Dec. 113, 720 N.E.2d 1068, 1071 (1999). The elements of damage available in this case include lost wages, the expenses of past and future medical care, and past and future pain and suffering.

The evidence establishes that Zurba's abdominal injuries, gall bladder problems, both surgeries, the adhesions, her ongoing pain since January 1995, and the irritable bowel syndrome all were proximately caused by the accident. Likewise, the evidence establishes that Zurba's emotional and psychological symptoms and conditions were proximately caused by the accident.

At trial, Zurba sought damages in excess of $2 million. The government argues that her damages must be limited to no more than $300,000, the amount set forth in her administrative claim. Following the trial on the issue liability, defendant moved to limit Zurba's damages to $300,000. On September 29, 2000, the Court denied the motion without prejudice, finding that resolution of the motion depended on disputed facts that could only be determined after a trial. Defendant renewed its motion just before trial, but the Court determined to rule on it after hearing and considering the evidence.

■ Statutes like the FTCA in which the government waives its sovereign immunity "must be construed strictly in favor of the [government] and not enlarge[d] ... beyond what the language requires." *United States v. Nordic Village, Inc.*, 503 U.S. 30, 33, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992). Under the FTCA, Zurba was required to present her claim to the appropriate administrative agency before bringing suit. 28 U.S.C. § 2675(a). The law generally bars a plaintiff from pursuing an action for an amount greater than the amount stated in her administrative claim. *Id.* § 2675(b). There are two exceptions set forth in § 2675(b). First, an increase over the amount stated in the administrative claim is permitted if there is newly discovered evidence that was not reasonably discoverable at the time the claim was presented. Second, an increase is permitted when there are intervening facts affecting the amount of the claim. The plaintiff has the burden of showing that the case comes within one of these exceptions. *E.g., Spivey v. United States*, 912 F.2d 80, 85 (4th Cir.1990). If one of the exceptions applies, recovery in excess of the amount of the claim is permitted, but

only to the extent that the increased amount is attributable to the newly discovered evidence or intervening facts. *E.g., Gallimore v. United States,* 530 F.Supp. 136, 139 (E.D.Pa.1982); *Low v. United States,* 795 F.2d 466, 471 (5th Cir.1986).

■ If the condition was reasonably known to or foreseeable by the plaintiff at the time the claim was filed, an increase will not be allowed. Conversely, if the condition was *not* reasonably known to or foreseeable by the plaintiff, an increase may be allowed. *See Milano v. United States,* 92 F.Supp.2d 769, 774 (N.D.Ill. 2000). The standard is an objective one, viewed from the standpoint of a reasonable person in the position of the plaintiff. *Id.* at 774.

■ A material, unforeseen increase in the severity of a particular condition can constitute "newly discovered evidence" or "intervening facts" under § 2675(b). The reason for this is simple: a plaintiff's knowledge that a condition or symptom exists does not necessarily mean that she knows how her health will develop in the future. In *Michels v. United States,* 31 F.3d 686 (8th Cir.1994), the court addressed the claim of a plaintiff who had suffered injuries to his hip, knee, and ankle. These injuries carried with them an inherent possibility of arthritis or necrosis which would require future surgery. The plaintiff did not factor these into his administrative claim because he did not show signs of arthritis or necrosis at that time. He later developed those symptoms and sought and obtained a significantly increased award at trial. The Eighth Circuit affirmed, stating that "a known injury can worsen in ways not reasonably discoverable by the claimant or his or her treating physician, and ... such 'newly discovered evidence' or 'intervening facts,' if convincingly proved, can warrant § 2675(b) relief." *Id.* at 688.

■ *Michels* stands for two principles. First, an increase in the severity of an injury can constitute "intervening facts" allowing an increase in the amount of the plaintiff's claim. Second, a statistical possibility that a more severe condition may result from the injuries known to the plaintiff at the time of her claim does not, by itself, make the more severe condition "reasonably foreseeable" for purposes of the § 2675(b) analysis. The possibility of arthritis or necrosis existed in Michels at the time of his claim, but the court in effect concluded that Michels reasonably believed that those conditions were unlikely to develop, and as a result he was not required to factor them into his claim.

Not all the Circuits agree that increased severity of a claimant's condition can permit an increase in her claim. The leading decision supporting a narrower approach is *Reilly v. United States,* 863 F.2d 149 (1st Cir.1988), in which the court concluded that "[t]he mere fact that ... dread consequences, feared from the beginning, had become more certain does not suffice to brand them 'newly discovered.' " *Id.* at 171. As Judge Pallmeyer indicated in *Milano,* the Seventh Circuit has not yet addressed the appropriate construction of § 2675(b)'s exceptions. *Milano,* 92 F.Supp.2d at 775. This Court agrees with Judge Pallmeyer that the narrower approach of *Reilly* and other cases is inappropriate, for it "would require that [a] Plaintiff inflate his claim based on events that are, although arguably foreseeable, highly unlikely.... Requiring that Plaintiff inflate his claim to account for the unlikely 'worst-possible scenario,' places the government ... in no better position to realistically assess the value of the Plaintiff's claim" at the administrative level. *Id.* at 776.

Most of the current possible future physical consequences of Zurba's abdomi-

nal and bowel problems were both likely and reasonably foreseeable prior to the date of her administrative claim. Dr. Torrence advised Zurba in April 1996 that she was likely to experience irritable bowel syndrome to a greater or lesser degree throughout her life. The consequences of this disorder have not increased in severity since the time of Zurba's claim, indeed they have decreased somewhat and may further decrease in the future.

The Court also agrees with defendant that it was reasonably foreseeable at the time of her claim that Zurba would continue to experience pain from the adhesions that resulted from her abdominal surgery. Zurba was essentially told as much around the time of her gall bladder surgery in December 1995. For the reasons stated in *Milano* and *Michels,* the possibility of additional future abdominal surgery was not reasonably foreseeable to Zurba at the time of her claim. However, based on the evidence at trial there is no basis to believe that Zurba will require surgery.

■ The side, back, and shoulder pain newly complained of by Zurba in the year 2000 do not appear to be associated with her abdominal pain and thus might constitute newly discovered evidence or intervening facts warranting an increase over and above the amount of her administrative claim. However, no doctor has yet arrived at a diagnosis of this pain; there is at most a possibility that it may indicate fibromyalgia. No evidence was introduced regarding what Zurba is likely to experience in the future if she in fact is suffering from this disease. Accordingly, these symptoms, though newly suffered by Zurba after the date of her administrative claim, do not warrant an increase in the claim amount.

■ Defendant argues that Zurba's emotional distress and her psychological disorders were known or reasonably foreseeable to her as of the date of her claim

and therefore do not warrant an increase over and above $300,000. The Court disagrees. It is noteworthy that Zurba's claim contains no mention of any emotional or psychiatric injuries. This suggests that Zurba did not realize that she was suffering from such injuries, which is consistent with the Court's findings regarding the evidence at trial. Zurba was aware by August 1996 (about 19 months after the accident) that she was experiencing lethargy and fatigue, but at the time she understood it to be the normal result of her recovery from surgery, her ongoing physical pain, and her bowel problems, and, as indicated earlier, she expected that these problems would subside as her pain subsided, and later, as her irritable bowel syndrome was brought under control as she expected it would be. She did not attribute these and her related problems to any psychological condition and certainly did not understand that they were the direct result of the accident and were separate and distinct from her physical injuries. Zurba likewise believed that her decreased activity level resulted from these same factors, including her frequent and intense need (throughout 1996 and after) to have bowel movements with no advance warning, which led her to restrict what she did and where she went. She had no idea at the time of her administrative claim that these problems would continue indefinitely or that they represented disorders that stood separate from her physical injuries. The Court finds that Zurba's understanding and beliefs in this regard were reasonable under the circumstances. In addition, she had no reasonable basis to believe that her symptoms would persist, let alone worsen significantly, as the Court has found they have done since the time of her administrative claim.

Zurba was aware prior to making her administrative claim of her fear that she might experience another calamity and

that she was, as a consequence, wary of boarding an airplane, driving in a car, or even walking along a street (which, of course, is what she had been doing when the January 1995 collision occurred). Zurba now realizes that these fears are the result of psychiatric conditions: an anxiety disorder and an adjustment disorder. But the question is whether Zurba reasonably realized or should have realized that at the time of her claim. The answer is no. As the Court has previously indicated, Zurba reasonably believed these to be the normal effects of having gone through what she had gone through, and not signs or symptoms of emotional distress or a psychiatric disorder. The Court finds that Zurba has demonstrated that she neither knew nor should have known as of August 1996 that she was suffering from a psychiatric condition or from emotional distress resulting from the accident.[2]

The fact that a handful of people suggested at various times that Zurba seek counseling did not trigger the necessary knowledge or foreseeability that she had a psychiatric or emotional condition. There is no reason to believe that Zurba's psychiatric disorder had even developed when this suggestion was first made to her at Northwestern Hospital a few days after the accident. A recommendation of counseling is, in this day and age, a common response to a person's experience with a calamity. It is likewise common to believe that people who undergo such experiences may suffer psychiatric consequences. But that is no more a basis for limiting Zurba's recovery here than was the plaintiff's potential for arthritis in *Michel.* Zurba's primary focus at the time was on the intense *physical* pain she was experiencing; a reasonable person in her position would not have foreseen that she then had, or would actually develop, a psychiatric condition.

The suggestions by various lay persons—Zurba's boyfriend and sister—that she see a counselor likewise did not give rise to the necessary knowledge or reasonable foreseeability that would require the Court to limit her to the amount of damages stated in her claim. As the Court has indicated, Zurba reasonably attributed what we now know to be her psychiatric symptoms to other factors.

Finally, defendant claims that one of Zurba's treating doctors, Dr. Romero, told her in May 1995 that she was experiencing psychiatric trauma resulting from the accident. The Court does not credit Dr. Romero's testimony in this regard. His contemporaneous records contain nothing to support the claim, or even that he discussed with Zurba her emotional symptoms or the changes in her lifestyle. Zurba denied that Dr. Romero has told her anything about psychiatric trauma. Based on the Court's observation of the witnesses at trial, we are not persuaded that Dr. Romero made such a statement to Zurba.

For these reasons, the Court concludes that Zurba's psychiatric disorders and her emotional distress constituted "newly discovered evidence" and/or "intervening facts" following the presentation of her administrative claim. Her damages from these injuries therefore are not subject to the $300,000 cap established by the claim. Zurba's damages for her physical injuries, however, are subject to the cap.

There remains only to determine the amount of damages to award to Zurba. For her physical injuries, she is entitled to recover damages for lost wages, the cost of

---

**2.** The evidence shows that an adjustment disorder, by definition, develops within three months of the stressful event that leads to the disorder. The question, however, is not when Zurba developed the disorder, but whether she realized or reasonably should have realized that she had it at the time she filed her administrative claim.

past and medical care, and pain and suffering. The parties have agreed that her lost wages amount to $15,000 and the cost of her medical care is $89,000. The odds of future necessary medical care are so slim that there is no basis for a damage award in this regard.

For her emotional injuries, Zurba is entitled to recover the cost of future medical care. The Court has found that it is reasonable to believe that a two year course of treatment will result in resolution of Zurba's condition and symptoms. The evidence establishes that weekly sessions with her treating psychologist will cost $13,000 over that period. It is reasonable to believe that Zurba will also require prescribed medication, which will necessitate regular visits with a psychiatrist. Based on the evidence at trial, two years of monthly sessions with a psychiatrist will cost $6,000. Thus the total damages for Zurba's future medical care totals $19,000; this amount is not subject to the $300,000 cap, as it arises from Zurba's emotional injuries.

■ Determination of Zurba's damages for physical pain and suffering and for emotional pain and suffering is a much more difficult task. Recently, in *Jutzi–Johnson v. United States*, 263 F.3d 753 (7th Cir.2001), a FTCA case, the Seventh Circuit highlighted the problems facing juries and judges in arriving at appropriate pain and suffering awards. *Id.* at 758. It suggested in *dictum* that "[t]o minimize the arbitrary variance in awards bounds to result from ... a throw-up-the-hands approach, the trier of facts should ... be informed of the amounts of pain and suffering damages awarded in similar cases. And when the trier of fact is a judge, he should be required as part of his Rule 52(a) obligation to set forth in his opinion the damages awards that he considered comparable." *Id.*

Neither party introduced during the trial any evidence about verdicts in comparable cases. The government offered some materials during its closing argument, but the Court initially sustained plaintiff's objection to this offer, finding that it should have been made as part of the evidence in the case so that the supposedly comparable matters it submitted could be subjected to adversary testing. However, after re-reviewing *Jutzi–Johnson* (which is not clear on when and how such evidence should be offered in a bench trial), the Court reconsidered and gave both parties the opportunity to submit materials regarding verdicts in cases they believed to be comparable.

The Court has reviewed the "comparables" offered by each party and has also done its own research. Before addressing them, a few words of caution are in order. *Jutzi–Johnson* does not discuss what types of "evidence" of comparable verdicts are acceptable. The only materials reasonably available to litigants are reported decisions from other cases or reports from publications such as the Cook County Jury Verdict Reporter. Reliance on such evidence carries with it inherent limitations. A reported decision concerning a trial cannot possibly relate the course of a trial with the same detail and flavor in which it was presented to the fact finder. The Jury Verdict Reporter and similar publications tend to operate by asking lawyers to respond to a series of pre-formatted questions about various particulars of the case. This fill-in-the-blanks approach, though certainly useful in helping lawyers evaluate cases, it at best a blunt instrument in helping a fact finder determine what damage award is appropriate.

The problems are compounded when the information that one is seeking concerns awards for pain and suffering, whether physical or emotional or both. There is no

exact standard for fixing damages for pain and suffering; courts routinely tell juries exactly this when instructing them. *See, e.g.,* 3 E. Devitt, C. Blackmar & M. Wolff, Federal Jury Practice and Instructions § 85.02 (1987 & Supp.2000); Fifth Circuit Pattern Jury Instructions (Civil) §§ 15.4 & 15.2 (1999) (the latter telling the jury that it "must use *sound discretion* in fixing an award of damages"). It is impossible to know all of the factors that led a jury or judge to make a particular award for pain and suffering in a particular case. The fact finder's observation and assessment of the plaintiff at trial, for example, may be a significant factor affecting the award upward or downward, but this factor is unlikely to be assessed in any source to which a court would look in attempting to determine comparability.

Just as importantly, different plaintiffs can experience different levels of pain and suffering from similar incidents. A defendant in a tort case "must take his plaintiff as he finds [her]," even if she is more susceptible to injury than the average person. *See, e.g., Reed v. Union Pacific Railroad Co.,* 185 F.3d 712, 717 (7th Cir.1999); *Colonial Inn Motor Lodge, Inc. v. Gay,* 288 Ill.App.3d 32, 45, 223 Ill.Dec. 674, 680 N.E.2d 407, 416 (1997). Thus two cases arising from similar incidents may not be all that similar at all. Our legal system has not attempted to set schedules of presumptive awards for various types of injuries, and a court cannot and should not do that under the guise of determining "comparability."

The government, though it was the first party to offer "comparables" consisting primarily of reports of jury verdicts, has suggested that jury verdicts should be used with great caution because the government's waiver of sovereign immunity provided by the FTCA allows only for bench trials. The government has cited no authority for this proposition, nor is the Court aware of any. Indeed, in *Jutzi–Johnson,* the Seventh Circuit cited several jury awards as comparable to the claim in that case. *See Jutzi–Johnson,* 263 F.3d 753, 760–61 (citing *Snyder v. Whittaker Corp.,* 839 F.2d 1085 (5th Cir.1988); *Dontas v. City of New York,* 183 A.D.2d 868, 584 N.Y.S.2d 134 (2d Dep't 1992) (per curiam) (reducing jury's award); *Turner v. Parish of Jefferson,* 721 So.2d 64 (La.App. 1998); *Stissi v. Interstate & Ocean Transport Co.,* 590 F.Supp. 1043 (E.D.N.Y. 1984)). Moreover, there is no hard-and-fast rule that juries make higher awards than judges. Under the circumstances, the Court sees no good reason to disregard or discount jury awards.

Some of the cases found by the Court or cited by the parties do inferentially yield possible ranges. The parties submitted a number of cases involving pain and suffering awards for abdominal injuries. The Court has considered these cases, comparing the relative severity of the injuries in them with those from which Zurba suffers and continues to suffer, and awards her damages for physical pain and suffering and disfigurement of $50,000 for the period from the date of the accident through her recovery from gall bladder surgery one year later, a period during which Zurba experienced frequent and intense physical pain.[3] The Court awards damages of $5,000 per year for the 5⅔ years that have passed from January 1996 through the present (a total of $28,333); the evidence shows that Zurba's pain decreased sub-

---

**3.** In the case of *Keehan v. RBI Sluggers Inc.,* No. 94 L 13216, one of the Cook County jury verdicts cited by defendant, the plaintiff appears to have been awarded $70,000 for pain and suffering stemming from stab wounds and removal of his gall bladder, in a case in which the report gives no indication of any lingering effects. A number of the cases cited by plaintiff resulted in larger pain and suffering awards.

stantially following her gall bladder surgery, though she did experience ongoing pain, discomfort, and inconvenience from irritable bowel syndrome, as well as ongoing disfigurement. Finally, the Court awards damages of $2,000 per year for the remainder of Zurba's 40–year life expectancy, on the grounds that she will continue to suffer pain and discomfort from her adhesions and possibly the irritable bowel syndrome throughout her life, pain which may increase in severity as time goes on. The total of these amounts is $158,333.

The parties have also cited several cases involving awards for emotional pain and suffering and conditions like post-traumatic stress disorder (PTSD), which though arguably a more severe condition than the one from which Zurba suffers is nonetheless similar. The Court's research was focused on finding awards for emotional pain and suffering and/or psychological conditions induced by sudden and unexpected accidents that might induce an ongoing fear of future calamities (essentially the condition, or part of it, from which Zurba suffers). We begin with those cases. Though there is no case that appears to be a perfect match for this one, *Smith v. Kmart Corp.*, 177 F.3d 19 (1st Cir.1999), is somewhat similar. In that case, the plaintiff and her husband sued a retail store for injuries suffered after the plaintiff was unexpectedly struck by an 8½ pound object that fell from a 10–foot high shelf as she was awaiting assistance from an employee. The plaintiff lost consciousness for less than a minute and briefly stopped breathing; she eventually was diagnosed with inflammation and compression of a cervical nerve, causing muscle spasms and pain in her neck. *Id.* at 22. She suffered from nightmares, irritability, mood changes, depression, difficulty sleeping, and impairment of her social and work relationships, and she was eventually diagnosed with PTSD, which her doctor said would require three to five years of psychi-

atric treatment. *Id.* The trial took place approximately two years after the injury. The court of appeals affirmed a jury award to the plaintiff of $500,000 for both physical and emotional pain and suffering, after surveying several other awards in the range of $200,000 to $500,000. *See id.* at 31–32. The plaintiff's husband, who had observed the accident, also sued to recover for emotional pain and suffering; he suffered no physical injury and there was no evidence that he suffered from any psychological condition. The court reduced the jury's award of $250,000 to $100,000, saying that the latter figure represented "the upper limit of a rational appraisal of [his] damages." *Id.* at 32–33.

In *Gough v. Natural Gas Pipeline Co. of America*, 996 F.2d 763 (5th Cir.1993), the court considered a jury verdict from a trial that took place almost ten years ago in a case brought by a captain of a fishing vessel that backed over a natural gas pipeline which then exploded, killing 11 of the 14 crew members. The plaintiff suffered no significant physical injuries but experienced depression, nightmares, and flashbacks, and was diagnosed with PTSD, which experts testified would require two to three years of treatment. *Id.* at 764–65. The jury's award for the emotional injuries and distress was in excess of $1.4 million. The Court noted a $500,000 pain and suffering verdict in an Illinois case brought by the survivor of a gas-leak explosion that destroyed a house, who suffered physical injuries and experienced PTSD. *Id.* at 767. It reduced the jury's $1.4 million award to $600,000, saying that amount "represents the maximum reasonable award for emotional distress" in light of the circumstances of the accident and the evidence of mental anguish. *Id.* at 767–68.

In *Hall v. Norfolk Southern Railway Co.*, 829 F.Supp. 1571 (N.D.Ga.1993), the trial court upheld a pain and suffering

award which was in excess of $500,000 (the exact amount could not be determined due to the general nature of the jury verdict). The plaintiff was a worker on a train that collided with another train, killing three occupants and injuring others; the plaintiff suffered a hip injury which he claimed caused pain but for which he was treated for only one month and for which there was no supporting medical testimony. He was also diagnosed with PTSD, which was attributed to "the horror of the train wreck [and the resulting chaos] and his fears for his own safety." *Id.* at 1576. The court noted that " 'pain and suffering is, to a large degree, not susceptible to monetary quantification,' " *id.* at 1584 (quoting *Simeon v. T. Smith & Son, Inc.,* 852 F.2d 1421, 1427 (5th Cir.1988)), but it nonetheless reviewed other similar cases. The court upheld the jury award. *Id.* at 1585.

The court in *Illinois Central Railroad Co. v. Gandy,* 750 So.2d 527 (Miss.1999), upheld a $750,000 jury award for emotional pain and suffering in a case similar to *Hall* in which the plaintiff was a worker on a train which collided with another, causing several fatalities. The plaintiff was diagnosed with PTSD, and the court specifically noted that he had "a sense of foreboding" of future injuries due to a prior "near miss," *id.* at 530, a factor that likewise applies to Zurba in light of the fact that both of her parents perished in automobile collisions. The plaintiff had suffered physical injuries in the accident but these did not cause him significant problems as of the time of trial. *Id.* at 529.

In two interrelated FTCA cases, a judge made significant awards for emotional pain and suffering to flight attendants who survived the crash of an airliner that was fatal to 37 passengers. *See DeMary v. United States,* 982 F.Supp. 1101 (D.S.C.1997); *Forcht v. United States,* 982 F.Supp. 1115 (D.S.C.1997). The resulting scene, like the one described in *Hall,* was almost unbelievably horrifying. *See DeMary,* 982 F.Supp. at 1105. The plaintiff in *DeMary,* a male flight attendant, suffered burns which, by the time of trial (about three years after the crash) no longer caused pain. *Id.* He was diagnosed with PTSD and depression, suffering, like Zurba, symptoms including feelings of guilt, belief "that something terrible will happen to him in the future," a restricted emotional range, difficulty communicating with others, irritability, outburst of anger, and difficulty in his personal relationships. *Id.* at 1106. Unlike Zurba, however, he had not been able to return to work, though an expert testified that it was likely he would be able to do so (though not as a flight attendant) within one to two years. The judge initially awarded the plaintiff $220,000 for his physical and emotional pain and suffering but later increased the award to $300,000. *Id.* at 1114–15. The judge's decision included a survey of several awards for emotional distress, ranging from $200,000 up to as much as $1 million. *Id.* at 1113 n. 9.

*Forcht,* the second case decided by the same judge concerning the airplane crash, concerned a female flight attendant who had experienced extreme pain from burns in the ten months following the crash but few physical effects other than scarring thereafter. Her emotional injury, diagnosed as PTSD, was severe. The court said that the evidence showed that prior to the crash she was, like Zurba, "fun, happy, vivacious, spontaneous, and carefree ... very confident and active ... [and] enjoyed traveling, swimming, shopping, and going to clubs. She seldom cried." After the disaster, again like Zurba, her "personality ... changed completely. She is very sad and cries frequently. She is extremely reluctant to go out in public, spending most of her time at home." She minimizes any travel, "is unable to handle even nor-

mal stresses of day to day life," and has frequent nightmares and flashbacks. *Forcht,* 982 F.Supp. at 1120. There was some evidence that her prognosis for recovery was poor, *id.* at 1123, but an expert described as a leading expert in the field of PTSD research testified that the plaintiff ought to be able to recover with two years of therapy. *Id.* at 1124–25. The court initially awarded the plaintiff $400,000 for pain and suffering and disfigurement but later increased this to $550,000. *Id.* at 1131.[4]

A judge awarded $200,000 for past and future emotional pain and suffering in a FTCA case involving an unreasonable strip search by customs inspectors of a woman suspected of carrying contraband in her body cavities. *Adedeji v. United States,* 782 F.Supp. 688 (D.Mass.1992) (a case that was tried nearly 10 years ago). Though the underlying tort is obviously far different from the one that Zurba experienced, it was not, at least not apparently, the type of incident that might cause a person to have intense fear of being victimized by unexpected calamities in the future—a factor that would suggest that Zurba's injury was more serious. In addition, unlike Zurba, the plaintiff had experienced difficult life circumstances prior to the events at issue that might have contributed to preexisting depression. *See id.* at 702.

Though some of the incidents in these cases were more calamitous than when the officer's car plowed into Zurba in January 1995, and though PTSD is arguably a more severe condition than the disorders from which Zurba suffers, her symptomatology and prognosis are not all that different from the plaintiffs in these cases. Having considered the cases discussed above and those cited by the parties, as well as the testimony regarding the severity of Zurba's injuries and her prognosis, the Court awards her damages for emotional pain and suffering of $40,000 per year for the four years prior to trial (when her symptoms became more severe), $20,000 per year for the 2 ⅔ years prior to that time after the accident, and a total of $25,000 for the next two years, the period in which it is reasonable to expect that Zurba's conditions will be resolved by treatment. The total of these amounts is $238,333, which is well within the range established by the cases discussed earlier.

In sum, the Court awards damages in the following amounts:

| | |
|---|---|
| 15,000 | Lost wages |
| 89,000 | Expenses of medical care |
| 158,333 | Physical pain and suffering |
| 19,000 | Future psychiatric care |
| 238,333 | Emotional pain and suffering |
| $519,666 | TOTAL |

From this amount the Court will offset the $100,000 that Zurba recovered from other tortfeasors. *See* fn. 1 *supra.*

### Conclusion

For the reasons stated above, defendant's renewed motion to reduce plaintiff's *ad damnum* [Docket Item 46–1] is granted as to plaintiff's physical injuries but denied as to her emotional injuries. Plaintiff's motion *in limine* # 2 [Item 49–1] is terminated as moot. The Court directs the Clerk to enter judgment in favor of plaintiff in the amount of $419,666.

---

**4.** The *DeMary* and *Forcht* cases provide a perfect illustration of the point made earlier by the Court that similar incidents can have different effects on different people.