United States Court of Appeals
Fifth Circuit

**F I L E D**

**January 16, 2007**

Charles R. Fulbruge III
Clerk

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

—————————

No. 05-30096

—————————

SHAUN LEE SMITH,

                                        Plaintiff–Appellee–Cross-Appellant,

versus

HARRAH'S NEW ORLEANS MANAGEMENT COMPANY,

                                        Defendant–Appellant–Cross-Appellee.

————————————————————————————————

Appeal from the United States District Court
for the Eastern District of Louisiana
No. 2:04-CV-27

————————————————————————————————

Before SMITH, GARZA, and CLEMENT, Circuit Judges.

PER CURIAM:[*]

    Before the court are the appeal and cross-appeal of the jury's findings in this personal injury

action.  For the reasons stated below, we affirm in part and reverse and remand in part.

## I.  FACTS AND PROCEEDINGS

    On December 10, 2003, Shaun Smith got in his father's truck—a 2002 F350 diesel-engine

truck, with two front wheels and four rear wheels—and drove to Harrah's casino in New Orleans.

_____

[*] Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published
and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

-1-

Over the course of an hour, he lost all of his money ($300–400) playing blackjack. While at the table, he consumed between two and four alcoholic drinks. After losing, he went to retrieve his truck from valet parking.

At the valet cashier's desk, which was outside the casino next to the valet driveway, no other customers were in line, and Smith placed his valet ticket on the counter. Apparently not observing this, the Harrah's employee continued her other work behind the counter. At some point, the Harrah's employee saw Smith's valet ticket and told him that he owed ten dollars for parking.

There is some dispute as to the specific words exchanged during the twenty minutes after Smith was told he needed to pay for parking. The Harrah's employees testified that Smith refused to pay and became verbally abusive, angry, and upset.[1] The Harrah's employees claim that Smith never once said that he did not have the money to pay. Smith claims that he did not know he would have to pay for valet parking, and in any event had lost all his money.

Before Smith refused to pay, however, a valet had been sent to retrieve Smith's truck. The valet did not have a radio and was not aware of the developing situation at the cashier's desk. The valet drove the truck into the pick-up area, and a few Harrah's employees walked over to tell the valet to re-park the truck. Smith, upon seeing his truck, walked diagonally across the driveway toward the driver's side door. He testified that he remembered that he had ten dollars in the center console. The Harrah's employees claim that Smith never said anything about money in the truck and continued using abusive language. When Smith got to the driver's side door, the valet, as instructed,

---

[1] The Harrah's witnesses testified that Smith "used the N-word" countless times in describing the black security manager with whom he dealt, Stacey Dorsey, and further that he made statements such as "I own you" and "I owned your grandfather." Smith admits to only using "the N-word" once but says that he was set off by Dorsey's calling him a "cracker" while refusing to retrieve his truck.

tried to drive away, but Smith grabbed onto the truck, and the valet stopped. The valet tried to drive away again, Smith grabbed again, and the valet stopped again. The third time the valet did not stop; Smith, holding onto the door's rear-view mirror, fell. He was run over by at least one of the two left rear tires, which protrude out from the truck's side.

While Smith was on the ground after being run over, all of the Harrah's employees walked away. At trial, they variously testified that they were calling for medical assistance or were otherwise trying to help or not aggravate the situation. Smith claims that Dorsey told him "[i]t serves you right" and walked away. The surveillance video that captured the scene shows all the employees walking away without urgency, leaving Smith on the ground unattended for a brief time. At some point, an on-site first responder arrived, and an ambulance followed less than ten minutes later.

Smith suffered spiral fractures to his left tibia and fibula. He underwent open reduction and internal fixation surgery, which resulted in a rod and screws being placed permanently in his left leg. Smith sued Harrah's and won a jury trial, the outcome of which both parties now appeal.

With respect to the damages issues preserved for appeal, four expert witnesses provided relevant testimony—Dr. Hamsa, Smith's consulting physician; Dr. Roberts, Smith's expert in the field of "vocational evaluation;" Dr. Stokes, called by Harrah's as an expert in "vocational rehabilitation counseling;"[2] and Dr. Boudreaux, a Tulane professor and expert in forensic economics. Dr. Hamsa testified that at the time of trial, Smith had a 20% impairment of the leg (*not* a 20% overall disability); that Smith could not perform work standing up for a full day but could work half days; that Smith's condition would get at least somewhat better after physical therapy; and that Smith could return to

---

[2] Dr. Stokes testified that he performs the same type of tests as Dr. Roberts but that he also performs actual job placement and counsels injured people who hope to return to the work force.

work in some capacity in the future.

Dr. Roberts, who examined Smith on May 22, 2004, five months after the accident and five months before the trial, testified that Smith would not be able to return to work in outdoor activities, including horse training;[3] that Smith would be able to return to the work force in some capacity, though he would be limited to sedentary or light work; that, at the time of trial, Smith was not even competitive for positions at the sedentary level; and that Smith's low educational accomplishments[4] would preclude him from most sedentary jobs (the majority of which are professional in nature).

Dr. Stokes, who examined Smith on July 8, 2004, seven months after the accident and three months before trial, testified that Smith could return to the work force; that Smith had below-average vocabulary, reading skills, and reasoning ability but scored average in math; that Smith probably would be able to return to part-time work with horses; and that jobs were available immediately in New Orleans and Hot Springs, Arkansas (where Smith reported living), at the sedentary and light-duty level, paying between $6.50 and $11.91 per hour.

Dr. Boudreaux forecasted Smith's lost future earnings. The main analysis was predicated on Smith earning $22,280 (the annualized amount of Smith's weekly earnings prior to the accident) and having an average work-life expectancy of 31.84 more years. If Smith were to return to full-time employment at $6.55 per hour, his lost future earnings, discounted to present value, would be $217,844; if Smith were to earn $10.05 per hour, his lost future earnings would be $46,508; for Smith not to lose any future earnings, he would have to earn close to $11 per hour.

---

[3] Smith testified that becoming a horse trainer was his career goal, though at the time of the incident he was not working as a horse trainer.

[4] Dr. Roberts testified that Smith could perform mental math on a fourth grade level and read on a sixth grade level. His overall functioning was at the eighth grade level.

The jury awarded Smith $2,400 for future medical expenses; $67,857 for past pain and suffering; $18,571 for future pain and suffering; $5,500 for loss of past earnings; $474,573 for loss of future earnings; and $357,142 for loss of life enjoyment. Past medical expenses were stipulated at $23,006.03. The jury verdict allocated 67% fault to Harrah's and 33% fault to Smith.

Harrah's timely moved for a new trial or, in the alternative, remittitur, with respect to the fault allocation, lost-future-earnings award, and loss-of-life-enjoyment award. The district court denied the motion. Harrah's then timely appealed. Smith timely cross-appealed, claiming that the jury erred in allocating any fault to Smith and that the jury should have awarded him more damages for each category.

## II. STANDARD OF REVIEW

In the district court, Harrah's moved for judgment as a matter of law ("JML") under FED. R. CIV. P. 50(a) and subsequently renewed its JML motion under Rule 50(b) and, in the alternative, moved for a new trial or remittitur. Harrah's challenged the jury's fault allocation, award for loss of future earnings, and award for loss of life enjoyment. On appeal, Harrah's requests a new trial on the fault allocation (requesting a reduction to 0–20% for its portion of the fault), remittitur on the lost-future-earnings award (requesting it be reduced to $0), and remittitur on the loss-of-life-enjoyment award (requesting it be reduced to $50,000).

With respect to the jury's allocation of fault, Harrah's "must show that the facts and inferences point so strongly and overwhelming in [its] favor that reasonable persons could not arrive at a contrary verdict." *Gough v. Nat. Gas Pipeline Co. of Am.*, 996 F.2d 763, 768 (5th Cir. 1993); *see also Esposito v. Davis*, 47 F.3d 164, 167 (5th Cir. 1995) ("While state law provides the substantive rules and tests in diversity cases, the applicable federal standard of review for a jury's

verdict is one of reasonableness."); *Marcel v. Placid Oil Co.*, 11 F.3d 563, 566 (5th Cir. 1994) (similar). All of the facts and inferences must be viewed "in the light most favorable to the verdict." *Prestenbach v. Rains*, 4 F.3d 358, 361 (5th Cir. 1993).

With regard to remittitur on the damages amounts, because Harrah's preserved its appellate arguments with its motions below, this court reviews the district court's denial of a new trial or remittitur for abuse of discretion. *See Marcel*, 11 F.3d at 568; *Esposito*, 47 F.3d at 167 (stating that, when a jury award is challenged through a motion for new trial or remittitur, the "standard of review is abuse of discretion of the district court, rather than the reasonableness of the jury's award"). "Where a damage award is excessive or so large as to appear contrary to right reason, the award is generally subject to remittitur, not a new trial." *Marcel*, 11 F.3d at 568; *see also Seidman v. Am. Airlines, Inc.*, 923 F.2d 1134, 1140–41 (5th Cir. 1991) ("[I]n the area of evaluating whether a jury's award is excessive, the appellate court should step lightly or not at all. A jury's award should not be disturbed unless it is entirely disproportionate to the injury sustained." (internal quotation and citation omitted)).[5]

Awards for loss of future earnings are classified as "special damages" under Louisiana law because they may be determined with relative certainty. *McDaniel v. Carencro Lions Club*, 934 So. 2d 945, 977 (La. Ct. App. 2006) ("Special damages are those damages which may be determined with some degree of certainty and include past and future medical expenses and past and future lost

---

[5] This court has
> expressed the extent of distortion that warrants [appellate] intervention by requiring such awards to be so large as to shock [the] judicial conscience, so gross or inordinately large as to be contrary to right reason, so exaggerated as to indicate bias, passion, prejudice, corruption, or other improper motive, or as clearly exceeding that amount that *any* reasonable man could feel the claimant is entitled to.

*Williams v. Chevron U.S.A., Inc.*, 875 F.2d 501, 506 (5th Cir. 1989) (internal quotation omitted).

wages."). "The plaintiff bears the burden of proving entitlement to special damages by a preponderance of the evidence." *Id.* If the jury awards greater special damages than plaintiff's evidence could justify, Louisiana courts reduce the award to the highest amount justified by the evidence presented at trial. *See Rayborn v. Diamond Offshore Co.*, 832 So. 2d 1052, 1058 (La. Ct. App. 2002) (lost-past-earnings award reduced from $46,000 to $35,453, the amount estimated by the testifying economist); *Dennis v. The Finish Line, Inc.*, 781 So. 2d 12, 42 (La. Ct. App. 2000) (lost-future-earnings award reduced from $132,402 to $73,312.50, or "the highest reasonable amount suggested by the [testifying] economists").

Because general damages are "not susceptible to monetary quantification, . . . the jury thus necessarily has especially broad leeway." *Seidman*, 923 F.2d at 1141 (internal quotation omitted). At least with respect to general damages, to determine whether an award is excessive, this court compares the challenged awards "with rulings in other factually similar cases decided under controlling law, here Louisiana law." *Marcel*, 11 F.3d at 568; *see also Seidman*, 923 F.2d at 1141 (looking to state cases applying Louisiana law and involving comparable injuries for the upper limit); *Williams v. Chevron U.S.A., Inc.*, 875 F.2d 501, 506 (5th Cir. 1989) ("Whether this amount represents an excessive recovery cannot be determined solely by comparison to awards . . . in other cases. However, we examine past awards for rough guidance in assessing the award at hand." (internal citation omitted)). If the general damages award is excessive in comparison to the other rulings, this court should not substitute its own judgment directly for the jury's; rather, the court employs the "maximum recovery rule" and reduces the award to 50% above the highest amount recognized in other state law cases. *See Salinas v. O'Neill*, 286 F.3d 827, 831 & n.6 (5th Cir. 2002).

While Harrah's preserved its arguments for appeal, Smith did not. He filed no post-verdict

motions. "It is well-established that there can be no appellate review of allegedly excessive or inadequate damages if the trial court was not given the opportunity to exercise its discretion on a motion for a new trial." *Bueno v. City of Donna*, 714 F.2d 484, 493–94 (5th Cir. 1983). In such cases, only exceptional circumstances warrant appellate intervention. "Exceptional circumstances are present when a pure question of law is involved and the asserted error is so obvious that the failure to consider it would result in a miscarriage of justice." *Vargas v. Lee*, 317 F.3d 498, 499 n.1 (5th Cir. 2003) (internal quotation omitted).

## III. DISCUSSION

### A. Fault allocation

Harrah's argues that the jury erred in finding that Smith was only 33% at fault. In this diversity case, the district court properly instructed the jury on the applicable Louisiana law for comparative fault. Under Louisiana law, a jury's allocation of fault is directed by five factors:

> (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought.

*Watson v. State Farm Fire & Cas. Ins. Co.*, 469 So. 2d 967, 974 (La. 1985). With respect to the first *Watson* factor, both parties' conduct involved an awareness of the danger, rather than inadvertence. The valet's job involves a constant need to pay attention to pedestrian traffic. The valet clearly knew Smith was in the vicinity of the truck, since the valet stopped the truck twice before the accident at Smith's behest. The valet, though, may not have realized that the dual rear tires protruded from the side of the truck. Smith, for his part, knew of the inherent danger of grabbing onto a moving vehicle.

As for the second *Watson* factor, both parties' conduct created a great risk of danger. In

deciding to drive the truck away, the valet created a danger of harming Smith. Before the accident, Smith already had grabbed onto the truck twice, showing his intention to do so again. Similarly, in grabbing onto the truck, Smith created a great danger to himself.

With respect to the third *Watson* factor, neither party sought something significant. The valet need not have driven away, since, according to Smith's testimony, Smith told the valet (through the closed window) that there was money in the center console. It was also not important that the truck leave immediately, as merely locking the door would have prevented Smith from obtaining possession until he paid the valet fee. However, little or no importance can be ascribed to Smith's conduct. Nobody was stealing his truck; the valet service to whom he originally entrusted his truck was simply re-parking it.

With respect to the fourth *Watson* factor, Harrah's had superior capabilities. The jury could infer that Smith was impaired from the two to four drinks, and that Harrah's knew of the impairment because some of its employees testified to smelling alcohol on Smith's breath.

With respect to the fifth *Watson* factor, Smith probably had greater extenuating circumstances which caused him to act "without proper thought." In the hour prior to the accident, Smith consumed two to four beers (though the drinking was Smith's own doing, the beers were provided by Harrah's). As well, the jury could infer that Harrah's precipitated the confrontation by repeatedly violating its internal policies by failing to tell Smith how to avoid the valet parking fee.[6] The jury also

---

[6] Several Harrah's employees admitted that it is standard for them to tell a customer how to avoid paying for valet fees by, for example, becoming a preferred member of their frequent-customer program or getting parking "comped" from a pit boss after losing money at the tables. As well, the employees testified that, had they known Smith had lost all his money, they would have told him how to get free parking. Each of the Harrah's employees testified, essentially, that Smith was cursing so much that they could not explain how to avoid paying.

could infer that a Harrah's employee provoked Smith with a racial epithet, escalating the confrontation. The jury could also have inferred that his anger was heightened by losing his money at the casino. However, the jury could also have determined that Smith provoked or escalated the situation by using racial slurs, which would weigh in favor of Harrah's. The allocation of fault "involve[s] credibility determinations and the resolution of disputed facts, findings at the very heart of the jury function." *Hardy v. Wal-Mart Stores, Inc.*, 237 F.3d 632, at *1 (5th Cir. 2000) (Table). The district court should only have granted a new trial if the jury acted unreasonably in evaluating the evidence. *Gough*, 996 F.2d at 768. As shown above, the evidence is sufficient to support fault by both parties. The allocation was within the province of the jury, and the district court did not abuse its discretion by not upsetting the jury verdict.

**B.      Loss of future earnings**

Awards for lost future earnings "are inherently speculative and intrinsically insusceptible of being calculated with mathematical certainty." *Melancon v. Lafayette Ins. Co.*, 926 So. 2d 693, 708 (La. Ct. App. 2006) (internal quotation omitted). Accordingly, such damages need only be shown with "such proof as reasonably establishes the plaintiff's claim." *Id.*; *see also Gunn v. Robertson*, 801 So. 2d 555, 565 (La. Ct. App. 2001) ("Future loss of earnings, which [is] inherently speculative, must be proven with a reasonable degree of certainty, and purely conjectural or uncertain future loss of earnings will not be allowed.").

Evidence showed that Smith would return to the workforce in some capacity, that Smith could have obtained a GED, and that jobs were available to him. Smith's primary basis for claiming extensive lost future earnings is that his dream of becoming a professional horse trainer has been

destroyed by the accident. No evidence established the earnings of a horse trainer.[7] Harrah's argues that the lost-future-earnings award was based on nothing but conjecture and speculation and cannot stand. The incongruity between the past-earnings and future-earnings awards supports this contention.

Contrary to Smith's repeated argument, every medical and vocational expert testified that Smith *will* be able to re-enter the labor market. However, Smith argues, and evidence supports, that he will not be able to reach his "ultimate goal" of becoming a horse trainer. As well, Smith will no longer be able to operate a commercial vehicle, such as a large truck used for carrying horses, for which he held a commercial driver's license. Smith's vocational expert also testified that it would be difficult for Smith to find a sedentary job because of his poor academic credentials.

Based on Dr. Boudreaux's analysis, if Smith expected to make $22,880 yearly (the annualized amount of his actual weekly earnings for the month prior to trial), and if Smith worked a low-paying job for the remainder of his work-life expectancy, he would suffer approximately $217,844 in lost future earnings.[8] Since *all* evidence pointed to Smith's being able to perform a sedentary or light-duty job, the only way for the jury to arrive at a $474,573 lost-future-earnings award was to assume that (1) but for the accident Smith would have made substantially more than anything indicated by his past work history; (2) Smith would be *unable* to hold or find a low-paid sedentary position; or (3) some combination of the two.

Reference to analogous cases is helpful, though not dispositive. In *Seidman*, this court

---

[7] Smith made several attempts to introduce evidence of horse-trainer earnings, but the district court excluded the proffered evidence as hearsay.

[8] No economic expert testified for Smith, so the only evidence the jury had was Smith's past earnings history and Dr. Boudreaux's estimates.

ordered remittitur when the plaintiff's earnings the year prior to the accident were "about $1,000 less than she could earn with full-time minimum wage employment." 923 F.2d at 1141. There, as here, "no one testified that [the plaintiff] would not be able to return to employment." *Id.* In *Williams*, this court upheld an award of $391,000 in future lost wages. 875 F.2d at 506. There, as here, the jury heard evidence from the plaintiff about his work-life expectancy and pre-accident earnings. In *Williams*, the plaintiff's expert calculated the exact amount rendered by the jury verdict. In the instant case, Smith did not offer an economic expert and all of the evidence showed that Smith could return to full-time work at a low-paying job. Nonetheless, the jury awarded Smith an amount twice as large as the defense expert's calculations.

The weight of the evidence is clearly against the jury verdict, but whether the *great weight* is against the jury verdict, as is necessary to meet the standard for granting remittitur, is a closer question. We hold that the higher burden has been met, because no evidence presented to the jury justified a lost-future-earnings award of even 50% of what the jury awarded Smith. The maximum amount a reasonable jury could have awarded, based on the evidence presented, is $217,844. We thus grant a remittitur and reduce Smith's award for loss of future earnings to $217,844, or if Smith chooses not to accept the remitted award, a new trial on the issue of damages for loss of future earnings. *Giles v. Gen. Elec. Co.*, 245 F.3d 474, 488 (5th Cir. 2001).

## C.     Loss of life enjoyment

"A plaintiff is entitled to recover damages for loss of life enjoyment if he proves that his lifestyle was detrimentally altered or if he was forced to give up activities because of his injury." *Day v. Ouachita Parish Sch. Bd.*, 823 So. 2d 1039, 1044 (La. Ct. App. 2002). Loss-of-life-enjoyment damages can be awarded separately from other general damages, such as mental and physical pain

and suffering. *See Stevenson v. La. Patient's Comp. Fund*, 710 So. 2d 1178, 1182 (La. Ct. App. 1998).

Harrah's argues that $357,142 is far too much compensation for Smith's not being able to bowl, run, or play basketball. Instead, Harrah's asks for remittitur to $50,000. Harrah's cites a few cases where plaintiffs suffered dissimilar, though more severe, injuries and were granted far lower damages. As well, Harrah's attempts to show impropriety by comparing the high loss-of-life-enjoyment award to the lower pain-and-suffering and future-medical-expenses awards. There is no direct correlation between these awards, and Harrah's cites no authority. Smith may suffer loss of life enjoyment although he is in little to no pain and does not require future surgery. It is uncontested that he has 20% impairment of his leg, including some ankle and knee immobility. However, it also is uncontested that Smith was not yet at maximum medical improvement, and that it is uncertain as to how much his leg will heal in the future.

Smith argues that the jury award is based in part on the fact that Smith no longer will be able to become a horse trainer (which occupation was held by his father, grandfather, and great-grandfather) and on his concomitant loss of self-worth. Smith advances a few other arguments, including that he had to "postpone his intended marriage" because of the loss of income; that he still suffers nightmares reliving the incident; that he has moved into a house (his parents') too small for his extended family; and that he cannot play with his children, ride horses, bowl, or play basketball.

Smith's strongest argument is that this court should focus, as do Louisiana state courts, on assessing total damages *in globo* rather than piecemeal. *See, e.g.*, *Richard v. Teague*, 636 So. 2d 1160, 1174 (La. Ct. App. 1994) ("In reviewing an award of general damages, a court of appeal is required to focus on the total award and not on each individual item."). In this way, he hopes to have

this court disregard any perceived jury indiscretion in the high loss-of-life-enjoyment award and treat such an award as general damages in combination with the pain-and-suffering awards. Smith cites to a few cases with comparable or lesser injuries and comparable or higher general damage awards. Here, however, the jury segregated each of the general damages awards as Smith asked it to do.

Behind Smith's argument that this court should review the general damages award as a whole is an implicit recognition that, in most cases, loss-of-life-enjoyment awards are lower than pain-and-suffering awards. While a general damages amount of $357,142 might not be excessive, such a large loss-of-life-enjoyment award goes beyond the norm.

Louisiana juries almost always grant lower loss-of-life-enjoyment awards than pain-and-suffering awards. We recognize that each plaintiff and each injury is different and that neither the state legislature nor the state courts have established a rule directing the proportion of the awards. Here, however, the large loss-of-life-enjoyment award is entirely disproportionate to any injury suffered, past or future. A review of state cases reveals that courts have limited loss-of-life-enjoyment awards to $50,000 in cases with comparable and more serious injuries, and we hold that this is the maximum amount the jury should have awarded. *See Simms v. Progressive Ins. Co.*, 883 So. 2d 473, 488–89 (La. Ct. App. 2004) (loss-of-life-enjoyment award reduced to $50,000 from $225,000 when the plaintiff was eventually "able to resume her regular life activities"); *Conner v. Stelly*, 830 So. 2d 1102, 1105, 1109 (La. Ct. App. 2002) (upholding a loss-of-life-enjoyment award of $50,000 when plaintiff conceived after a tubal ligation); *Day v. Ouachita Parish Sch. Bd.*, 823 So. 2d 1039, 1044 (La. Ct. App. 2002) (upholding a loss-of-life-enjoyment award of $50,000 when plaintiff injured his back and was unable to continue playing sports or pursue a strenuous occupation). To determine the size of the remittitur, we add 50% to the maximum amount a jury could reasonably

-14-

have awarded Smith. *Giles*, 245 F.3d at 488–89. We thus hold that Smith's award is remitted to $75,000 for his loss of life enjoyment, with the option of a new trial on loss-of-life-enjoyment damages if he chooses not to accept the remittitur.

**D.      Smith's cross-appeal**

As previously noted, Smith made no post-trial motions. Accordingly, this court should not intervene unless exceptional circumstances exist, wherein "a pure question of law is involved and the asserted error is so obvious that the failure to consider it would result in a miscarriage of justice." *Vargas*, 317 F.3d at 499 n.1 (internal quotation omitted). Smith urges, largely without citation or record support, that the jury's damages determinations should be increased with respect to his future medical expenses, loss of past earnings, and past and future pain and suffering. His arguments fail to show the presence of exceptional circumstances warranting relief. Accordingly, we deny all of Smith's claims on cross-appeal.

## IV.  CONCLUSION

For the foregoing reasons, we AFFIRM the jury's findings on allocation of fault, REVERSE the district court's decision on remittitur, and REMAND for further proceedings consistent with this opinion.